Arthur Jordan Foundation v. Commissioner.
Arthur Jordan Found. v. Commissioner
Docket No. 31263.
United States Tax Court
1953 Tax Ct. Memo LEXIS 377; 12 T.C.M. (CCH) 109; T.C.M. (RIA) 53042; February 10, 1953
John E. Hughes, Esq., 105 West Adams, Chicago, Ill., John W. Hughes, Esq., and Harold R. Burnstein, Esq., for the petitioner. Lyman G. Friedman, Esq., for the respondent. TURNER Memorandum Findings of Fact and Opinion TURNER, Judge: The respondent determined deficiences and penalties against the petitioner as follows: Year Ended
25 Per Cent
Declared Value
25 Per Cent
June 30
Income Tax
Penalty
Excess Profits Tax
Penalty
1944
$14,174.73
$ 3,543.68
$ 5,932.23
$1,483.06
1945
39,104.91
9,776.23
14,867.07
3,716.77
1946
39,979.10
9,994.78
1947
56,686.48
14,171.62
1948
72,223.65
18,055.91 It has been stipulated that there is no deficiency in either income or declared value excess profits *378 taxes and no penalty due from the petitioner for the fiscal years ended June 30, 1944, 1945, 1946 and 1947. Also, that there is no penalty due for the fiscal year ended June 30, 1948. By amended answer, the respondent now asks for an increased deficiency in income tax for the fiscal year ended June 30, 1948, to $108,323.65, on the ground that a deduction claimed by the petitioner in the amount of $100,000 for "Debenture Amortization" should have been disallowed by him in his determination. It has been stipulated that only if the petitioner is not entitled to deduct its gross income under section 162(a) of the Internal Revenue Code, or in the alternative, is not tax exempt under section 101 (6) of the Code, the deficiency for the fiscal year ended June 30, 1948, is $108,323.65. The questions at issue are whether the petitioner was exempt from tax under the provisions of section 101 (6) of the Code, and if not, was it an association taxable as a corporation, or if taxable as a trust, was it entitled to deduct its entire income under section 162 (a) of the Code. Findings of Fact Most of the facts have been stipulated and are found as stipulated. The petitioner *379 was established by a trust agreement dated December 24, 1928. Its office is located in Indianapolis, Indiana. Petitioner filed fiduciary returns for the years involved with the collector of internal revenue for the district of Indiana. The trust agreement was executed by the donor, Arthur Jordan, and seven trustees, one of whom was the donor. The purpose of the Foundation is recited as the "promoting of charitable, educational, religious, literary, scientific and social advancement, including music and the arts, among all mankind." The assets turned over to the Foundation consisted of the following: 15.000 shares of the common capital stock of Arthur Jordan Piano Company, of Washington, D.C., having a par value of $10 each; also, 1,852 shares of the same company held as collateral security; 2,000 shares of the common capital stock of Homer L. Kitt Company, of Washington, D.C., having a par value of $100 each; also, 1,000 shares of the same company held as collateral security; 421 shares of the common capital stock of Indiana College of Music and Fine Arts, of Indianapolis, Indiana, having a par value of $100 each; 8,798 shares of common capital stock of The International *380 Printing Company, of Indianapolis, Indiana, having a par value of $25 each; also, 15,462 shares of the same corporation held as collateral security; 183 shares of the common capital stock of Metropolitan School of Music, of Indianapolis, having a par value of $100 each; 1,000 shares of the common capital stock of Education Service, of Chicago, Illinois, having no par value; 150 shares of the common stock of Fisk Teachers' Agency of Chicago, Illinois, having a par value of $100 each; 250 shares of Arthur Jordan Land Company, of Indianapolis, Indiana, having a par value of $100 each; A parcel of real estate on G. Street, in Washington, D.C.; and Four parcels of real estate in Chicago, Illinois. The Foundation was to assume all contracts, options, collateral agreements, notes and obligations of Arthur Jordan in connection with any of the above-described corporations and properties. The petitioner found the operations of The International Printing Company to be unprofitable. The business was sold and the corporation was dissolved. Homer L. Kitt Company was incorporated in 1922, under the laws of the District of Columbia, for the purpose of conducting a piano and music *381 business at 1330 G Street, N.W., Washington, D.C. The amount of its capital stock was $200,000, divided into 2,000 shares of a par value of $100 each, all of which was common stock. Arthur Jordan Piano Company was originally incorporated in March, 1914, under the laws of Virginia and under the name of Juelg Piano Company, Inc. Its purpose was to conduct a piano and music business in Virginia, the District of Columbia, and other places. Its principal office was to be located in Alexandria, Virginia. Its authorized capital stock was to be $100,000 maximum and $10,000 minimum, and was to be divided into shares of $10 each. 5,000 shares, amounting to $50,000, was to be 7 per cent preferred stock, and 5,000 shares, amounting to $50,000, was to be common stock. In February, 1917, the name of the corporation was changed from Juelg Piano Company Inc., to Arthur Jordan Piano Company, Inc., at which time Arthur Jordan was president and Homer L. Kitt was secretary. In the latter part of 1917, the capital stock was increased to $150,000, 5,000 shares, amounting to $50,000, as preferred stock, and 10,000 shares amounting to $100,000, as common stock. In August, 1918, the capital stock was increased *382 to $250,000, the preferred stock remaining at 5,000 shares, in the amount of $50,000, and the common stock being increased to 20,000 shares, in the amount of $200,000. The petitioner, from its inception until 1943, owned 75 per cent of the stock of Arthur Jordan Piano Company and the Homer L. Kitt Company, and Homer L. Kitt owned 25 per cent thereof. In 1943 the petitioner purchased Homer L. Kitt's stock in the two corporations and forthwith, on or about July 1, 1943, transferred to itself all of the assets of the two corporations and thereafter operated the two stores. The two corporations were immediately liquidated. After the dissolution of the two corporations, the petitioner continued to operate the two businesses, and was doing so during the taxable year ended June 30, 1948. Arthur Jordan died in September, 1934. For all of the years prior to July 1, 1943, the two music companies were taxable as corporations under the Internal Revenue Code and filed Federal corporate income tax returns. The particular objects for which the petitioner was formed are: a. To receive, take and hold, invest and reinvest, any gift, devise, bequest, or other voluntary contribution of moneys *383 or of any real estate or personal property, including the property in this instrument described as well as any and all property hereafter conveyed to the trust by the Donor or by any other person or persons, either absolutely or in trust, for the purpose of creating, establishing and maintaining a fund or funds and applying the principal and income thereof to the purposes hereinafter mentioned. b. To apply the entire earnings and profits thereof solely to charitable, educational, religious, literary, scientific purposes and social advancement, including music and the arts, in order to promote the well-being of mankind throughout the word, and particularly in the United States. c. An amount equal to at least one-tenth and not more than one-half of the net earnings and profits of the Foundation each year shall be retained and added to its permanent fund, and invested judiciously in the same manner as other funds of the Foundation are invested, until the total funds of the Foundation amount to five million dollars, and thereafter the entire net annual income and profits of the Foundation shall be applied and expended solely for the purposes of the Foundation and in the manner as herein *384 set forth. The trust instrument further provided: "In no event shall less than one-half of the net earnings of the Foundation for any current year be used and expended in that year for the philanthropic and beneficent purposes of the Foundation, as set forth in this trust instrument, the intention being that not less than fifty per cent nor more than ninety per cent of the current net profits and earnings of the Foundation, other than such amounts as may be derived by gifts or other contributions of money or property, shall be distributed each year, until the net assets shall have reached the total of five million dollars, and that thereafter the entire amount of the net annual profits and earnings shall be applied and distributed solely for such philanthropic and beneficent purposes by its board of trustees and as nearly as may be within the calendar year in which it is accrued. "In case a loss occurs that depletes the investment fund of the Foundation, a portion not greater than forty per cent of the net annual earnings for that or any subsequent years may be used to replace the funds of the Foundation so lost; but if a surplus has been accumulated which has been added to the *385 investment funds and known as the 'accumulated earnings funds' by the retaining of ten per cent or more of the net earnings of previous years, as above provided in article 'c', then such depletion in the 'investment fund' of the Foundation shall in the discretion of the board of trustees be restored by taking it out of such accumulated earnings fund, or it may be partially restored out of such fund to the extent of the amount of said fund. "No more than one-third of the net annual earnings and profits of the Foundation shall be given to any one institution or person in any one year." The powers and duties of the trustees consisted of: The management and control of the Foundation, to own all property converted to it; to conserve the property and to apply it and the proceeds thereof to the purposes of the trust; In their discretion, to receive and hold any property and interest in any property which might be acquired by them in aid of the Foundation, provided that the terms upon which any such property shall be acquired are not out of harmony with the objects and purposes of the Foundation; To make regulations for the government and management of the Foundation and to prescribe *386 the terms and conditions upon which its facilities shall be avilable for its philanthropic purposes, all of which were to conform with the provisions of the trust agreement; To elect officers and to employ other officers, assistants and employees as may be needed; "To use the income of the property and the profits of the Foundation in the execution of the trusts hereby imposed, as set out in articles 'a', 'b' and 'c' hereof; and in case the funds derived from the earnings and profits shall at any time in any year be in excess of the requirements of the Foundation at that time necessary to meet its obligations as they become due, to invest all or any part thereof until such time within that year as they shall be required for distribution for the philanthropic objects and purposes set forth in this trust agreement"; The selection of trustees at end of terms or to fill vacancies in accordance with the eligibility prescribed for trustees; "In addition to the duties of the Trustees herein set forth, a majority thereof shall have the power to make all kinds of deeds of conveyance of real estate and other property; to sell, assign and transfer any personal property or interest therein; *387 to execute mortgages, leases, notes, contracts, releases, acquittances, and all other kinds of legal instruments for the benefit of this trust. They shall have the right to pledge and accept collateral securities; to buy and sell notes, mortgages, bonds, stock or any other kind of personal and real property, in furtherance of this trust. They shall have the right to designate some member of the Board of Trustees to vote at stockholders' meetings in any corporation in which this trust may hold stock, either in person or by proxy. They shall have the right to borrow money and to mortgage real estate or other property of the trust as security for the payment of such money; to loan money on approved securities and to buy and sell all kinds of property, real or personal, and do all acts necessary and consistent therewith. They shall have the right to bring suit and be sued on behalf of said trust; "In the management of the property this day conveyed, and any that may hereafter be conveyed to, or otherwise come into the possession of the trust, consisting of corporation stocks, bonds and other securities, real estate, or personal property, or investments with other firms and persons; if *388 in order to promote and conserve the best interest of the trust in its respective properties, it shall be deemed necessary by the Trustees from time to time to advance and loan money or other property to such corporations, firms or persons, they shall have full power and authority to make such loan and advancements of money and property; "The Trustees are authorized to retain any investment property or business that Donor or other person may convey to them so long as they deem the same advantageous to the trust, and to invest in any stock, either common or preferred, debenture certificate or other security whether of a character permitted by law for trust investment or not, that the Trustees in their judgment and discretion consider advantageous to the trust and in the management of any securities they may require that the custodian thereof give corporate bond and may pay the premium for such bond, but the Trustees shall not be liable personally in any event, except as herein set out; and "The Trustees shall have full power and authority to accept conveyances and transfers of property and to assume and agree to pay encumbrances on said property. And all of this shall be done without *389 any obligation on the part of purchasers or third parties to look to the application of the funds or property involved, and the Trustees shall not be held accountable for any loss or for any use of discretion where they have acted in good faith. And the Turstees shall have such other powers not inconsistent with the specific powers and duties defined in this instrument as may be necessary to enable them to carry out the objects and purposes of the Foundation, and accordingly the foregoing enumeration of specific powers and duties shall not be construed to limit the Trustees, but shall operate in furtherance of the accomplishments of the duties and purposes of the Foundation, as herein set forth." The agreement also contained provisions relating to place and time of annual and monthly meetings, quorum and manner of transacting business. It was provided that each trustee should receive a salary of $1,000 per year for his attendance at the meetings of the trustees and committees of the Foundation and services incidental thereto. With respect to the distribution of funds, the trust agreement provided as follows: "The Board of Trustees shall have exclusive power to select and determine *390 the particular charities, institutions and objects which shall receive aid, donations or regular appropriations from the Foundation and the amount to be given to each, and no funds shall be expended and no appropriations made for any of the purposes of the Foundation, except by the affirmative vote of four (4) or more of the Trustees." There was a provision that the Foundation could be incorporated should the board of trustees deem it advisable, provided the corporation was to be known as Arthur Jordan Foundation and was to carry on for the purposes named in the trust agreement. It was further provided in the trust agreement that: "No Trustee shall be personally liable for any act done while acting as such Trustee, except wilful misappropriation of funds, and their signatures to any written instrument as Trustees of the ARTHUR JORDAN FOUNDATION shall bind the ARTHUR JORDAN FOUNDATION, a trust, only, it being the purpose and intent that the ARTHUR JORDAN FOUNDATION is a separate entity, managed and controlled by its Trustees, who shall act for and on behalf of such Foundation and not in their individual capacity." The trust was irrevocable and perpetual. The petitioner reported *391 on its return its profit and loss statement for the operation of its two piano and music stores during the fiscal year ended June 30, 1948, as follows: GROSS SALES: Pianos and Organs
$1,146,900.89
Less Trade-in-Loss
23,154.87
Net Piano Sales
$1,123,746.02
Radio Sales
$ 257,717.65
Washing Machine Sales
30,398.12
Instrument Sales
187,766.55
Piano Merchandise Sales
26,256.20
Record Sales
61,081.32
Record Merchandise Sales
8,629.01
Sheet Music Sales
73,339.52
Music Merchandise Sales
55,492.13
Total Gross Sales
$1,824,426.52
Cost of Goods Sold -
Pianos and Organs
$ 604,645.99
Radios
169,367.19
Washing Machines
19,672.71
Small Instruments
106,769.07
Piano Merchandise
18,780.74
Records Bought
33,999.33
Record Merchandise
$ 5,484.72
Sheet Music
44,002.86
Music Merchandise
36,094.94
Total Cost of Goods
$1,038,817.55
Net Profit on Sales
$ 785,608.97
Revenue -
Interest and Carrying Charge
$ 21,243.99
Guarantee Contracts
978.55
Hauling Revenues
7,801.75
Lesson Revenue
43,039.84
Rental Revenue
44,932.80
Radio Repair Revenue
27,292.06
Tuning and Repair Revenue
40,542.62
Instrument Repairing
11,021.14
Discount Revenue
11,226.57
Total Gross Earnings For'd.
$ 993,688.29
Gross Earnings Forwarded
$ 993,688.29
EXPENSES: Advertising
$ 81,795.24
Building Maintenance
1,460.34
Car Fare
2,713.10
Collection Expense
4,994.00
Hauling Expense
24,604.74
Commission
98,338.38
Freight and Expense
17,803.00
General Expense
24,789.74
Contributions in D.C.
5,034.30
Insurance
5,118.32
Legal Expense
408.47
Lesson Expense
32,111.90
Light and Heat
3,496.77
Meals
266.70
Organ Expense
3,230.28
Outside Hauling
8,390.23
Postage
3,181.92
Printing and Stationery
3,070.89
Radio Repair Expense
19,001.24
Rent
7,099.98
Salaries
208,388.86
Special Allowances
487.65
Taxes (Not Income)
15,523.97
Telephone & Telegraph
11,821.77
Washing Machine Repair
310.95
Tuning and Repair Expense
35,647.16
Traveling Expense
3,123.04
Trade-in-Loss (Not pianos)
15,036.45
Storage Expense
8,442.22
Depreciation Charges
717.24
Bad Debts
82.91
Small Instrument Repair Expense
3,101.87
Income Tax Adjustment
399.43
Building and Inventory Depreciation
57,669.09
Total Expenses
$ 707,662.15
Net Earnings
$ 286,026.14
*392 The petitioner's opening inventory, purchases and closing inventory for the said fiscal year were reported as follows: Inventory
Inventory
Kind
7-1-47
Purchases
Total
6-30-48
Cost
KITT STORE
Musical Merchandise
$ 28,419.45
$ 31,657.60
$ 60,077.05
$ 24,212.13
$ 35,864.92
Piano Merchandise
956.00
12,250.79
13,206.79
3,563.00
9,643.79
Records
15,739.78
38,360.98
54,100.76
20,101.43
33,999.33
Record Merchandise
3,611.80
4,440.83
8,052.63
2,567.91
5,484.72
Sheet Music
18,272.91
48,570.48
66,843.39
22,840.53
44,002.86
Small Instruments
56,477.43
107,864.09
164,341.52
60,548.44
103,793.08
Pianos
133,630.26
374,834.74
508,465.00
183,992.06
324,472.94
Radios
55,565.00
76,320.32
131,885.32
5,923.43
125,961.89
Total
$312,672.63
$694,299.83
$1,006,972.46
$323,748.93
$683,223.53
JORDAN COMPANY
Piano Merchandise
$ 2,448.15
$ 9,202.80
$ 11,650.95
$ 2,514.00
$ 9,136.95
Radios
46,830.54
6,256.46
53,087.00
9,681.70
43,405.30
Pianos
115,707.55
289,982.95
405,690.50
125,517.45
280,173.05
Washing Machines
2,282.80
17,573.78
19,856.58
183.87
19,672.71
Small Instruments
6,546.45
3,772.65
10,319.10
7,343.11
2,975.99
Music Merchandise
230.02
230.02
230.02
Total
$173,815.49
$ 327,018.66
$ 500,834.15
$145,240.13
$ 355,594.02
Total Both Companies
$486,488.12
$1,021,318.49
$1,507,806.61
$468,989.06
$1,038,817.55
Inventory Reserves
86,118.74
89,242.47
Net Inventory
$400,369.38
$379,746.59
*393 On its fiduciary return for the fiscal year ended June 30, 1948, the petitioner reported a total income of $350,539.57 and a net income of $207,339.78. It has been stipulated by the parties that a deduction of $100,000, entitled "Debenture Amortization," was in error. The items of income reported by the petitioner on its return were as follows: Dividends
$ 17,499.15
Interest on bank deposits, notes, cor-
poration bonds, etc.
33.60
Interest on Government obligations,
etc.
24,367.38
Rents and royalties
9,022.23
Net gain from sale or exchange of
capital assets
392.07
Profit from trade or business
286,026.14
Other income - Fees
13,200.00
Total income
$350,539.57
The petitioner's net income as shown on the return, before deductions claimed for amounts distributed to beneficiaries, was $207,339.78. It claimed a deduction for the following distributions: Butler University
$ 34,000.00
Arthur Jordan Cons.
19,000.00
Y.M.C.A.
18,600.00
Week Day Religious Educ.
1,500.00
Indianapolis Symphony
5,100.00
Church Federation
1,000.00
Good Will Industries
1,000.00
Community Fund
1,500.00
Marion County T.B. Association
200.00
American S.S. Union
300.00
Christamore House
1,000.00
Boy Scouts of America
1,000.00
Girl Scouts of America
1,000.00
American Red Cross
500.00
Scholarships
9,400.00
Berea College
1,000.00
DePauw University
5,000.00
Hanover College
5,000.00
Indianapolis Theater Assn.
5,663.75
Antioch College
500.00
Arthur Jordan Foundation
95,076.03
Total
$207,339.78
*394 The petitioner's actual cash contributions for the year involved were: Good Will Industries
$ 500.00
Church Federation of Indianapolis
1,000.00
Y.M.C.A. of University of Illinois
100.00
Wellesley College
1,000.00
Bach Choir of Indianapolis
50.00
Boy Scouts of America
1,500.00
Berea College
1,000.00
Christamore House
1,000.00
Community Fund
1,500.00
American Red Cross
500.00
Marion County T.B. Association
200.00
Girl Scouts of America
1,000.00
American S.S. Union
300.00
DePauw University
6,000.00
Hanover College
6,000.00
Young Men's Christian Association
20,000.00
Indiana State Symphony Society
5,100.00
Butler University
34,000.00
Jordan College of Music
34,000.00
Student Scholarships
2,978.75
Total
$117,728.75
The petitioner's balance sheet for the taxable year is as follows: ASSETS
Beginning of Taxable Year
End of Taxable Year
Cash
$ $ 208,352.75
$ $ 183,403.99
Notes and accounts receivable
271,842.70
552,833.60
Less: Reserve for bad debts
123,707.22
148,135.48
123,707.22
429,126.38
Inventories: Finished Goods
400,369.38
379,746.59
Investments in governmental obligations: Obligations of all instrumentalities of
the United States issued on or after
March 1, 1941
995,843.75
704,000.00
Other Investments: Common Stocks
288,916.02
295,166.45
Debentures
141,304.35
430,220.37
32,347.23
327,513.68
Capital assets: Real Estate and Buildings
741,244.64
1,067,515.31
Furniture and Fixtures
60,375.68
26,384.15
Total depreciable assets
801,620.32
1,093,899.46
Less: Reserve for depreciation
438,902.86
362,717.46
496,777.06
597,122.40
Other assets: Prepaid Insurance
2,524.38
2,648.12
Tax Refunds
6,348.42
8,872.80
TOTAL ASSETS
$2,554,511.99
$2,623,561.16
LIABILITIES
Accounts Payable
$ 137,069.14
$ 134,961.69
Accrued expenses: Taxes
4,562.25
3,799.95
Other liabilities
21,011.11
Contingent reserve
115,000.00
115,000.00
Investment fund
2,021,734.43
2,022,234.43
Accumulated earnings fund
225,135.06
347,565.09
TOTAL LIABILITIES
$2,554,511.99
$2,623,561.16
*395 On October 19, 1929, the respondent had ruled: "The Arthur Jordan Foundation is a trust and under the provisions of Section 162 (a) of the Revenue Act of 1928 it may deduct any part of its gross income without limitation, which, pursuant to the terms of the trust agreement, is during the taxable year paid or permanently set aside for the purpose and in the manner specified in Section 23 (n) of said act or is to be used exclusively for religious, charitable, scientific, literary or educational purposes." In response to a query from the petitioner, the respondent on January 24, 1930, after quoting the above ruling, advised petitioner as follows: "Accordingly, any part of the income of your trust, which, pursuant to the terms of the trust agreement is paid or permanently set aside for charitable, educational, or other purposes is deductible whether the amount is given to organization to assist worthy individuals to obtain an education, assist families in destitute circumstances or for other charitable and educational purposes." On June 3, 1948, the respondent reversed his position and made the following ruling: "The exemption provided by section 101 (6) of the Internal Revenue Code *396 applies to corporations, funds, etc., organized and operated exclusively for one or more of the purposes prescribed by that section. An organization which is organized for such purposes and which is actually engaged in activities designed to carry out those purposes will not be denied exemption merely because it also engages in business activities which finance those primary purposes and activities if the profit making activities are relatively minor in extent or may be considered incidental to the primary purpose of the organization. However, in cases where a primary activity of an organization is the operation of a profit making business it is believed that it cannot be said that it is organized and operated exclusively for the purposes specified in section 101 (6) of the Code or the corresponding provisions of prior revenue acts, even though its net income is, by the terms of the instrument under which it is created and the provisions of the law under which it is organized, destined eventually for exempt purposes. It is held, therefore, that you have not shown that the Arthur Jordan Foundation is entitled to exemption from Federal income tax under the provisions of section 101 (6) of the Internal Revenue Code *397 and the corresponding provisions of prior revenue acts. "In view of the fact that the business operations of the Foundation have changed from holding securities, receiving dividends and other similar income to those of the active management of the businesses formerly engaged in by the dissolved corporations the stock of which had been held by the Foundation, it is now the opinion of this office that the Arthur Jordan Foundation is an association which is taxable as a corporation for Federal income tax purposes. The aforementioned Bureau ruling is modified accordingly." No substantial part of the petitioner's activities has consisted of carrying on propaganda or otherwise attempting to influence legislation. From and after July 1, 1943, the major activity of the petitioner has been the operation for profit of the competitive businesses formerly owned and operated by the Arthur Jordan Piano Company and the Homer L. Kitt Company. Opinion While the parties seem to differ on the order in which the issues should be considered and decided, and there is some indication of difference as to which issue should be regarded as the primary issue and which as being in the alternative, nevertheless, *398 the questions presented are whether for the year in question the petitioner was exempt from tax under the provisions of section 101 (6) of the Internal Revenue Code; if not, was it an association taxable as a corporation or was it a trust taxable as such; and if a trust, was it entitled to deduct its entire gross income, under section 162 (a) of the Internal Revenue Code. The same questions as those in this case were presented and decided in John Danz et al., 18 T.C. 454, and while there are some differences here and there in the facts of the two cases, they are not distinguishing differences and our reasoning and conclusions in that case are equally applicable here. While it may be that, as created, the petitioner in the instant case might have been privileged to indulge in direct charity, we think it apparent that it, as was true in the Danz case, was of the "feeder" type of organization, and, on the facts, it seems apparent that it followed that method of operation, namely, that such of its earnings and income as were used for religious, charitable, or educational purposes were contributed to other organizations which *399 were directly engaged in endeavors in the fields mentioned. In order to qualify for exemption under section 101 (6), supra, [1] the petitioner must have been organized and operated exclusively for the purposes set forth. Whether it did or did not meet those requirements in the earlier years of its existence, as the respondent ruled, is not before us. In any event, the facts show that from and after July 1, 1943, its major activity was that of conducting for profit the competitive businesses theretofore carried on by two corporations, the Arthur Jordan Piano Company and the Homer L. Kitt Company. Such activities, as we discussed and explained in John Danz et al., supra, do not meet the requirements of section 101 (6). The situation here is not at all comparable to that which existed in Trinidad v. Sagrada Orden, 263 U.S. 578, where it was stated that the business activities of the organization therein did not amount to engaging in trade, in any sense of the term, and that there was no claim that there was any selling to the public or in competition with others; and further, that financial gain was not the end to which the activity was directed. Such was not *400 true of the petitioner herein, where the activities in question were plainly an engaging in trade or business for profit in competition with others and financial gain was the end to which those activities were directed. We accordingly conclude and hold that the petitioner was not exempt under section 101 (6), supra. With respect to the claim of the respondent that the petitioner was an association taxable as a corporation, everything said in the Danz case is equally applicable here. The petitioner was not an organization taxable as an association under the provisions of the Internal *401 Revenue Code, but, to the contrary, as was likewise true in the Danz case, was a trust, taxable as such. One question remains and that is to what extent was the petitioner, in determining its taxable net income, entitled, under section 162 (a), supra, [2] to deduct its gross income. In that section, it is provided that a trust, such as we have here, shall be allowed to deduct, without limitation, any part of its gross income which, pursuant to the terms of the will or deed creating the trust, is during the taxable year "paid or permanently set aside" for the purposes specified. The facts show that during the taxable year the petitioner actually made contributions to various religious, charitable and educational organizations in amounts totaling $117,728.75. In our opinion, there can be no question that those amounts were distributed for the purposes specified in the statute, and the deduction thereof is allowed. As to the remainder of the petitioner's gross income, the situation is the same as that which existed in the Danz case. Not only was there no payment thereof for the specified purposes but, likewise, there was no "permanent" setting aside of such earnings for the required *402 purposes. To that extent, the claim of deduction is denied. Decision will be entered under Rule 50. Footnotes
1. SEC. 101. EXEMPTIONS FROM TAX ON CORPORATIONS. The following organizations shall be exempt from taxation under this chapter - * * *
(6) Corporations, and any community chest, fund or foundation, organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes, or for the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private shareholder or individual, and no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation;…↩
2. SEC. 162. NET INCOME. The net income of the estate or trust shall be computed in the same manner and on the same basis as in the case of an individual, except that - (a) There shall be allowed as a deduction (in lieu of the deduction for charitable, etc., contributions authorized by section 23 (o)) any part of the gross income, without limitation, which pursuant to the terms of the will or deed creating the trust, is during the taxable year paid or permanently set aside for the purposes and in the manner specified in section 23 (o), or is to be used exclusively for religious, charitable, scientific, literary, or educational purposes, or for the prevention of cruelty to children or animals, or for the establishment, acquisition, maintenance or operation of a public cemetery not operated for profit;↩